[No. F020306. Fifth Dist. May 8, 1995.]

BRITZ, INC., et al., Plaintiffs and Appellants, v.
ALFA-LAVAL FOOD & DAIRY CO. et al., Defendants and Respondents.

## COUNSEL

Thomas E. Campagne, Cotkin & Collins, Joan M. Dolinski and Jeffrey L. Garland for Plaintiffs and Appellants.

McCormick, Barstow, Sheppard, Wayte & Carruth, Stephen R. Cornwell, Wildman, Harrold, Allen & Dixon, Craig M. White and Thomas J. Verticchio for Defendants and Respondents.

## OPINION

**VARTABEDIAN, J.**—This is an appeal from a judgment confirming an arbitration award. Appellants primarily contend that arbitration should not have been compelled in the first instance and that the arbitrator failed to disclose certain conflicts of interest. We reverse the judgment and remand the matter to superior court for further proceedings consistent with this opinion.

### FACTS AND PROCEDURAL HISTORY

*The Underlying Controversy.*

The merits of the underlying controversy are not before us in this appeal. (*Moncharsh* v. *Heily & Blase* (1992) 3 Cal.4th 1, 11 [10 Cal.Rptr.2d 183, 832 P.2d 899].) Accordingly, we only briefly summarize the rather complex facts.

Appellants are interrelated corporations that, in various combinations, contracted with respondents to buy and lease certain machines and equipment essential to the operation of a tomato paste processing plant. The total sale/lease price exceeded $1.5 million.

The plant never reached its production goals and appellants closed the plant during its first season of operation. They sold the plant at a substantial loss. They then sued respondents in Fresno County Superior Court for more than $10 million in compensatory and exemplary damages.

*The Arbitration.*

The sales and lease contracts contained arbitration clauses. Respondents moved in the superior court for an order staying appellants' lawsuit and

compelling arbitration of the dispute. Appellants contested this motion. The motion was granted.

The arbitration was to be conducted through the American Arbitration Association (AAA). Pursuant to a list of potential arbitrators submitted by AAA, the parties agreed to the appointment of a single arbitrator, John Peterson, a Fresno attorney.

The arbitration was bifurcated. The liability portion began on January 6, 1992. The arbitrator issued an interim award in favor of respondents on May 22, 1992. He issued a final award in favor of respondents in the amount of $587,425, plus costs and attorney fees in an unspecified amount, on March 31, 1993. The award was served by mail on the parties on April 6, 1993. After additional submissions by the parties, the arbitrator on May 6, 1993, issued a supplemental award of $1,412,953.75 for respondents' attorney fees and $696,747.45 as costs.

### The Controversy About the Arbitrator's Neutrality.

Respondents were represented in the initial superior court proceedings by McCormick, Barstow, Sheppard, Wayte & Carruth, a Fresno law firm (McCormick). Attached to their petition to compel arbitration was a copy of a demand for arbitration filed with AAA. That document named as respondents' attorneys Craig M. White and Michael Dockterman of Chicago, Illinois. White and Dockterman are with the Chicago law firm of Wildman, Harrold, Allen & Dixon (Wildman). With one important exception, the Wildman firm, not McCormick, appeared for respondents in the arbitration. When the matter returned to superior court after the arbitration, both McCormick and Wildman appeared for respondents.

After Peterson issued his interim award in favor of respondents, appellants requested that Peterson disclose all past and present relationships with the McCormick firm. Eventually, Peterson did so. The relationships included a number of referrals of legal business to Peterson and his firm from McCormick in the ordinary course of business. These did not involve any financial relationship between the two firms.

Peterson also disclosed that in 1984 he had been retained by McCormick as an expert witness in a legal malpractice case McCormick was defending on behalf of another Fresno law firm. In addition, Peterson disclosed that in November of 1991 and December of 1991 he had been retained by McCormick as an expert witness in two other legal malpractice cases in which McCormick represented law firm defendants. He was still involved in the 1991 cases at the time of the disclosure.

In November 1991, attorneys from McCormick tried to have a subpoena issued by the superior court for the production of documents by a third party

involved in construction of appellants' tomato processing plant. The superior court declined to issue the subpoena; it instructed respondents to seek the subpoena from the arbitrator. This gave rise, on December 2, 1991, to the only appearance in the arbitration by a McCormick attorney.

On that date, Attorney John T. Savrnoch of McCormick mailed to Peterson a three-page letter on McCormick letterhead. The letter referenced the pending arbitration and requested issuance of a subpoena on behalf of respondents, explaining in detail the importance of the requested materials to respondents' arbitration presentation. The letter included the following statement: "By this letter, the attorneys for Alfa-Laval respectfully request that a records only deposition subpoena be served upon L&A Engineering, Inc. for the following documents . . . ." Peterson granted the request for subpoena by means of a letter from Peterson to McCormick, together with joint addressees Wildman, appellants' attorney, and the attorney for L&A Engineering.[1]

Peterson disclosed his role as an expert witness for McCormick on July 9, 1992, and, in greater detail, on July 15, 1992. Based on this relationship and the referrals of cases to Peterson and his firm by McCormick, appellants requested appointment of a new arbitrator by letter to AAA dated July 21, 1992. AAA, after soliciting input from respondents and Peterson, declined on August 4, 1992, to disqualify Peterson. The AAA decision did not contain a statement of reasons.

Appellants sought relief in the superior court and by petition for extraordinary writ in this court. All of appellants' efforts were unsuccessful.

Peterson presided over the damages portion of the arbitration beginning February 22, 1993.

*Postarbitration Proceedings in Superior Court.*

Appellants renewed their petition to vacate the arbitrator's award on April 21, 1993, noticing a hearing for May 28, 1993, in superior court. They alleged Peterson's various connections with McCormick created a reasonable impression of possible bias on Peterson's part. Respondents petitioned to affirm the award. Both parties submitted declarations of various attorneys. The parties also relied on Peterson's letter of July 9, 1992, in which he states:

"In the past, when I have arbitrated a matter involving a party represented by the McCormick, Barstow firm, I have advised the American Arbitration

---

[1]Appellants' motion to augment record on appeal, filed July 19, 1994, is denied. Appellants' request for judicial notice (Mar. 24, 1995) and respondents' motion to augment record on appeal (Mar. 28, 1995) are granted.

Association that I have been on McCormick, Barstow's referral list. I would have done so in this case had I believed that McCormick, Barstow represented Alfa-Laval in the arbitration, or in any other capacity.

". . . I knew in April 1991 that McCormick, Barstow had represented Alfa-Laval in the Superior Court action. To the best of my knowledge then, and since then, McCormick, Barstow was not to be, and was not, involved in the arbitration."

The trial court conducted a law and motion hearing on the petitions to vacate and to confirm the award. The court determined that AAA's disposition of appellants' request for Peterson's disqualification was subject to only the limited judicial review available for factual and legal determinations of the arbitrator. In accordance with that standard, the court determined AAA's resolution of the conflict issue was a "plausible interpretation of the law and facts and was rendered with a minimum standard of fair dealing." Secondarily, the court concluded that appellants and their attorney had sufficient information before Peterson was selected as arbitrator about Peterson's relationship with McCormick to place upon appellants a duty of inquiry concerning these relationships; by failing to inquire in a timely manner, appellants waived objection to both types of relationships, the business referrals and the expert witness employment.

The court dismissed appellants' petition to vacate the arbitrator's award and granted respondents' petition to confirm the award, including attorney fees and costs, with interest from the date of the award through entry of judgment. Judgment was entered on July 16, 1993. The total judgment was for $2,732,477.51, plus costs of the superior court proceedings.

Appellants filed a timely notice of appeal on September 14, 1993.

## DISCUSSION

The parties impliedly agree that this case is governed by the Federal Arbitration Act (9 U.S.C. § 1 et seq.) (the Act). (See 9 U.S.C. § 2 [the Act covers arbitration arising from a "written provision in . . . a contract evidencing a transaction involving (interstate) commerce . . . ."].) ▇ "Generally, under the Act, arbitration is strongly favored, and 'any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration . . . .' [Citations.]" (*Rice* v. *Dean Witter Reynolds, Inc.* (1991) 235 Cal.App.3d 1016, 1023 [1 Cal.Rptr.2d 265].)

The Act, however, provides that an arbitration clause is not enforceable if "grounds as exist at law or in equity for the revocation of any contract" permit relief from the arbitration clause. (9 U.S.C. § 2; see Code Civ. Proc.,

§ 1281.) We will turn first, therefore, to appellants' contention that such grounds exist and that the trial court impermissibly compelled arbitration of the present dispute. After concluding that arbitration was properly ordered, we will address appellants' contention that the business relationships between Peterson and McCormick created a reasonable appearance of bias. We will conclude with a brief discussion of appellants' remaining points on appeal.

### I. *Prearbitration Issues: Was the Order for Arbitration Proper?*

Appellants contend the trial court erred in ordering arbitration of their claims against respondents. Appellants argue they were entitled to judicial resolution of the disputes because the arbitration clauses in the contracts were void: "[F]raud permeated the entire contracts, including their arbitration provisions. The fraud was directed 'not only to the contracts as a whole, but to the agreements to arbitrate as well.'"

The fraud alleged by appellants is set forth in the complaint and in declarations by appellants' representatives who negotiated the contracts. These documents allege that critical representations made as to·the performance and maintenance requirements of certain machines were false. They allege the representations were intended to induce, and did induce, appellants to enter into the contracts to buy and lease the machines. The complaint then states: "The false representations went not only to the contracts as a whole, but to the agreements to arbitrate, as well. Plaintiffs were led to believe by defendants that plaintiffs had to agree to arbitration as a *sine qua non* for acquisition of the equipment, bags and filling machines." Neither the complaint nor the declarations allege that this latter representation by respondents, i.e., that there could be no contract without an arbitration clause, was false.[2]

It has long been established that fraud of the sort alleged by appellants does not prevent enforcement of an arbitration clause in a contract, even though the contract as a whole might be revocable due to the fraud. The seminal case is *Prima Paint* v. *Flood & Conklin* (1967) 388 U.S. 395 [18 L.Ed.2d 1270, 87 S.Ct. 1801]. In that case, defendant sold plaintiff a paint manufacturing business. Collateral to the sales contract, plaintiff entered into another contract retaining defendant as a business consultant. The consulting

---

[2]For the first time, in appellants' reply brief, there is the statement that appellants were "told that, to obtain the Alfa-Laval system and Alfa-Laval's expertise, it had to agree to arbitration. [Record cite to declarations.] Indeed, *these statements were as false* as Alfa-Laval's earlier statements that its equipment was highly reliable . . . ." (Italics added.) There is no record citation for this latter claim, and the citation to the opening brief is to a discussion of the representations about the machines, not about the necessity of agreeing to an arbitration clause.

contract contained an arbitration clause. (388 U.S. at pp. 397-398 [18 L.Ed.2d at pp. 1273-1274].)

When a dispute arose under the contract, plaintiff sued in federal district court for rescission on the basis of fraud. Plaintiff contended defendant had falsely represented that it was not insolvent. (388 U.S. at p. 398 [18 L.Ed.2d at p. 1274].) Defendant petitioned the court to compel arbitration of the dispute. The federal district court granted the petition and the Court of Appeals affirmed. (*Id.* at pp. 399-400 [18 L.Ed.2d at pp. 1274-1275].)

The issue before the Supreme Court was whether under the Act the enforceability of the arbitration clause depended on the validity of the contract containing the arbitration clause, that is, whether the plaintiff was entitled to a judicial determination of its claim for rescission, or whether that was an issue for the arbitrator. (388 U.S. at p. 402 [18 L.Ed.2d at pp. 1276-1277].) The court concluded: "[I]f the claim is fraud in the inducement of the arbitration clause itself—an issue which goes to the 'making' of the agreement to arbitrate—the federal court may proceed to adjudicate it. But the statutory language does not permit the federal court to consider claims of fraud in the inducement of the contract generally." (*Id.* at pp. 403-404 [18 L.Ed.2d at p. 1277], fn. omitted; see also *Moses H. Cone Hospital* v. *Mercury Const. Corp.* (1983) 460 U.S. 1, 22-23, fn. 27 [74 L.Ed.2d 765, 784, 103 S.Ct. 927]; *Ericksen, Arbuthnot, McCarthy, Kearney & Walsh, Inc.* v. *100 Oak Street* (1983) 35 Cal.3d 312, 322 [197 Cal.Rptr. 581, 673 P.2d 251] [adopting same standard under Code Civ. Proc., § 1280 et seq.].)

Appellants contend they have satisfied the requirement for judicial determination of their right to rescind the contracts: "The Federal Arbitration Act also requires that, in the face of allegations that fraud induced the arbitration agreement, the parties are entitled to have a jury decide whether a valid agreement to arbitrate exists." This contention is mistaken.

The allegations in the present case are the same as in *Prima Paint, supra,* 388 U.S. 395, namely, that the contracts generally were a result of respondents' fraud. There is no allegation whatsoever that appellants were fraudulently induced to enter into the arbitration agreements in any way different from the way they were induced to pay money or make other agreements under the contracts. The only fraud alleged is as to the contracts generally.

The present case is wholly different from the cases appellants cite in which the issue of fraud was judicially determined. In some of those cases, the plaintiff did not know he or she was entering into a contract at all, or did not know it contained an arbitration clause. (See *Strotz* v. *Dean Witter Reynolds, Inc.* (1990) 223 Cal.App.3d 208, 217-218 [272 Cal.Rptr. 680] ["plaintiff has alleged that defendants deceived her as to the nature and

effect of the documents"]; *Ford* v. *Shearson Lehman American Express, Inc.* (1986) 180 Cal.App.3d 1011, 1028-1029 [225 Cal.Rptr. 895]; *Main* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1977) 67 Cal.App.3d 19, 30, 32 [136 Cal.Rptr. 378]; see also *Rice* v. *Dean Witter Reynolds, Inc., supra,* 235 Cal.App.3d at pp. 1024-1025.[3]) In the other case appellants cite, *Green* v. *Mt. Diablo Hospital Dist.* (1989) 207 Cal.App.3d 63, 71 [254 Cal.Rptr. 689], plaintiff alleged the contract in question was illegal and that the pervasive illegality eviscerated the arbitration clause. (See *id.* at p. 73.)

In the present case, there is no allegation appellants did not know what they were signing, that they signed under duress, or that the contracts were illegal. Instead, the allegations show that in order to secure a competitive advantage in the tomato paste industry, appellants agreed to buy and lease respondents' machines and to arbitrate disputes with respondents. Whether the purchase, lease and arbitration agreements were fraudulently induced was a question properly determined by arbitration. (*Lynch* v. *Cruttenden & Co., supra,* 18 Cal.App.4th at p. 810.)

## II.  *Postarbitration Issues.*

### A.  *Waiver of the Arbitrator's Alleged Conflict of Interest.*

Appellants learned the full extent of Peterson's contacts with McCormick after they lost the liability portion of the arbitration. At that time, appellants sought disqualification of Peterson and appointment of a new arbitrator. They sought this relief from the AAA, the trial court, this court (by writ petition) and, finally, by renewed petition in the trial court to vacate the final arbitration award. Appellants' requests were denied.

Appellants now raise the conflict of interest issue on this appeal. Respondents contend that, as the trial court found, appellants waived this issue when they initially accepted Peterson as the arbitrator without any inquiry concerning his contact with McCormick.

In some measure, we agree with respondents. Substantial evidence supports the trial court's finding that one of appellants had timely knowledge that Peterson's firm received business referrals from McCormick. There is nothing in Peterson's subsequent disclosures that indicates the more recent referrals were different in kind or frequency from the pattern of referrals of

---

[3]One recent case, citing all of the foregoing cases in support of its conclusion, stated: "California cases are unanimous in holding that *Prima Paint* does not require arbitration where, as alleged here, the plaintiffs were so deceived they did not understand they were contracting." (*Lynch* v. *Cruttenden & Co.* (1993) 18 Cal.App.4th 802, 811 [22 Cal.Rptr.2d 636].)

which appellants were generally aware. As to those matters, appellants selected Peterson as arbitrator without seeking further disclosure. This waived appellants' objection to Peterson based on his failure to disclose business referrals. (*Health Services Management Corp.* v. *Hughes* (7th Cir. 1992) 975 F.2d 1253, 1262-1263.)

When we turn to the expert witness relationship, however, we must agree with appellants that the trial court erred as a matter of law. No substantial evidence supports a finding that appellants waived this basis for Peterson's disqualification.

Common sense and experience tell us there is a vast difference between a relationship six years dormant, about which appellants knew, and a current and thriving relationship, about which appellants knew nothing prior to the arbitration. The relationship about which appellants knew was much the same as the relationship between the arbitrator and the party in *Merit Ins. Co.* v. *Leatherby Ins. Co.* (7th Cir. 1983) 714 F.2d 673. In that case, 14 years before the arbitration, the arbitrator had been a subordinate employee of the president of one of the parties to the arbitration, when both men had worked for a different insurance company. (*Id.* at p. 680.) The arbitrator failed to disclose that information. In rejecting a subsequent motion to vacate the arbitration award, the court concluded, "And when a former employee sits in judgment on a former employer there is no presumption that he will be biased in favor of the former employer; he may well be prejudiced against him." (*Ibid.*)

So, too, in the present case. Appellants may well have concluded that the isolated nature of Peterson's previous experience as a witness for McCormick may have left him slightly bitter about that firm, or at least devoid of positive feelings. He was, after all, never again asked to serve as an expert witness for McCormick, as far as appellants knew.

By contrast, the new engagements, coming just a few weeks before the commencement of the arbitration, established a current monetary connection between Peterson and McCormick. Such a relationship, as a matter both of perception and of reality, is wholly different from the 1984 employment about which appellants had knowledge. We conclude the earlier service as an expert witness did not put appellants on notice there might be a current relationship with McCormick; appellants were entitled to rely on Peterson's duty to disclose. (See *Betz* v. *Pankow* (1993) 16 Cal.App.4th 931, 937 [20 Cal.Rptr.2d 841]; cf. *Betz* v. *Pankow* (1995) 31 Cal.App.4th 1503 [38 Cal.Rptr.2d 107] [duty *to investigate* for conflicts is narrower than duty *to disclose* known conflicts]; *San Luis Obispo Bay Properties, Inc.* v. *Pacific Gas & Elec. Co.* (1972) 28 Cal.App.3d 556, 569 [104 Cal.Rptr. 733] [same].)

As a practical matter, of course, appellants had no choice but to rely on Peterson for voluntary disclosure. Even if appellants had assumed the obligation to inquire about current employment by McCormick at the time of Peterson's appointment as arbitrator, Peterson would have answered truthfully that there was no such employment. The employment arose months later, in circumstances appellants could not reasonably have anticipated when they agreed to Peterson as the arbitrator.

This practical view of the matter—that the conflict information is usually known only to the arbitrator and the opposing party—has led to a consistent line of cases holding that the arbitrator has a duty to disclose potential conflicts of interest. (See *Commonwealth Corp.* v. *Casualty Co.* (1968) 393 U.S. 145, 149 [21 L.Ed.2d 301, 304-305, 89 S.Ct. 337];[4] *Kaiser Foundation Hospitals, Inc.* v. *Superior Court* (1993) 19 Cal.App.4th 513, 517 [23 Cal.Rptr.2d 431]; *Wheeler* v. *St. Joseph Hospital* (1976) 63 Cal.App.3d 345, 371 [133 Cal.Rptr. 775, 84 A.L.R.3d 343]; *Johnston* v. *Security Ins. Co.* (1970) 6 Cal.App.3d 839, 842 [86 Cal.Rptr. 133].) While "the consequences of such a failure [to disclose] may be overcome if the pertinent facts are actually revealed, or otherwise become known, to the parties in some other fashion" (*Kaiser Foundation Hospitals, supra,* at p. 517), the outdated and ambiguous information appellants possessed about Peterson's service as an expert witness did not adequately supplant the duty to disclose in this case. (See *ibid.*)

In summary, appellants knew the essence of one basis for objection to Peterson's qualifications as arbitrator, namely, the referral of cases between Peterson and McCormick in the ordinary course of business. Accordingly, that objection was waived by the failure to pursue it prior to Peterson's appointment as arbitrator. (*Health Services Management Corp.* v. *Hughes, supra,* 975 F.2d 1253 at pp. 1262-1263; see *Ray Wilson Co.* v. *Anaheim Memorial Hospital Assn.* (1985) 166 Cal.App.3d 1081, 1089-1090 [213 Cal.Rptr. 62].) The objection based on Peterson's enlistment by McCormick as an expert witness in November and December of 1991, however, was not waived. (*Kaiser Foundation Hospitals, Inc.* v. *Superior Court, supra,* 19 Cal.App.4th at p. 517.) Our discussion of the ramifications of Peterson's relationship with McCormick will address only that latter relationship.

B. *The AAA Determination and the Standard of Judicial Review.*

Rule 19 of AAA Rules of Commercial Arbitration provides: "Disclosure and Challenge Procedure—Any person appointed as neutral arbitrator shall disclose to the AAA any circumstance likely to affect impartiality, including any bias or any financial or personal interest in the result of the arbitration or

---

[4]Also cited as *Commonwealth Coatings Corp.* v. *Continental Casualty Co.*

any past or present relationship with the parties or their counsel. Upon receipt of such information from the arbitrator or another source, the AAA shall communicate the information to the parties and, if it deems it appropriate to do so, to the arbitrator and others. Upon objection of a party to the continued service of a neutral arbitrator, the AAA shall determine whether the arbitrator should be disqualified and shall inform the parties of its decision, which shall be conclusive."

In the present case, appellants "object[ed] . . . to the continued service" of the arbitrator and the AAA "determine[d] whether the arbitrator should be disqualified." It determined Peterson was not disqualified to conduct the arbitration. The next issue we address is the standard for judicial review of that determination.

Respondents assert, and the trial court agreed, that the determination of arbitrator bias was entitled to the same degree of finality that is afforded any other issue submitted for determination by an arbitrator. Respondents therefore contend the AAA decision on this issue must be upheld if it "represents a 'plausible interpretation' of the law and fact and was reached in accordance with a 'minimum standard of fair dealing.'" Appellants contend the trial court should have reviewed the issue of arbitrator bias de novo.

*Moncharsh* v. *Heily & Blase, supra,* 3 Cal.4th at page 11, was decided under the California Arbitration Act. However, in an extended section entitled "The General Rule of Arbitral Finality," the Supreme Court relied upon cases arising under the Federal Arbitration Act as the basis for its discussion and conclusions. The court's analysis in *Moncharsh* provides a useful starting point for our discussion.

"Thus, both because it vindicates the intentions of the parties that the award be final, and because an arbitrator is not ordinarily constrained to decide according to the rule of law, it is the general rule that, 'The merits of the controversy between the parties are not subject to judicial review.' . . .

"Thus, it is the general rule that, with narrow exceptions, an arbitrator's decision cannot be reviewed for errors of fact or law. In reaffirming this general rule, we recognize there is a risk that the arbitrator will make a mistake. That risk, however, is acceptable for two reasons. First, by voluntarily submitting to arbitration, the parties have agreed to bear that risk in return for a quick, inexpensive, and conclusive resolution to their dispute. . . .

". . . . . . . . . . . . . . . . . . . . . . . .

"*A second reason why we tolerate the risk of an erroneous decision is because the Legislature has reduced the risk to the parties of such a decision*

*by providing for judicial review in circumstances involving serious problems* with the award itself, or *with the fairness of the arbitration process.* [Citing to Code Civ. Proc., § 1286.2, subds. (a)-(c).]" (3 Cal.4th at pp. 11-12, italics added.)

A similar theme is apparent in *Commonwealth Corp.* There, the majority opinion emphasizes the importance of a neutral and detached arbitrator, since arbitrators "have completely free rein to decide the law as well as the facts and are not subject to appellate review." (*Commonwealth Corp.* v. *Casualty Co., supra,* 393 U.S. at p. 149 [21 L.Ed.2d at p. 305].)[5]

Our research and that of the parties has unearthed but two cases directly addressing the issue of finality of the arbitration administrator's determination of disqualification. Neither is helpful.

In *Van Syoc* v. *Walter* (1992) 259 N.J.Super. 337 [613 A.2d 490], the Appellate Division of the Superior Court, without discussion or citation of relevant authority, applied the following standard of review: "The trial judge's conclusion that plaintiffs had failed to show that the AAA did not, as a matter of law, act arbitrarily or capriciously is fully supported by the record." (*Id.* at p. 492.)

In *Freeport Constr. Co.* v. *Star Forge, Inc.* (1978) 61 Ill.App.3d 999 [19 Ill.Dec. 57, 378 N.E.2d 558, 560], the court held that the state arbitration statute, which used the same language about arbitrator bias as the Act, required de novo consideration of a bias claim. However, the court noted that the AAA rules in question, those for the construction industry, did not assert the finality of any AAA determination on disqualification.

Nor do we find helpful the cases engaging in limited judicial review of arbitration decisions that respondents say are analogous to a disqualification determination. Many of respondents' cases, such as *Orion Pictures* v. *Writers Guild of America* (9th Cir. 1991) 946 F.2d 722, are labor relations cases arising under the federal Labor Management Relations Act (LMRA) (29 U.S.C. § 185). The issue in those cases is whether the parties have presented an arbitrable issue. The LMRA permits this prearbitration determination to be made by a federal district court or by the arbitrator, at the parties' election. (See *George Day Const. Co., Inc.* v. *United Broth. of Carpenters*

---

[5]Even in those federal courts that have taken the narrowest possible view of the grounds for disqualification under the Act, there is still an emphasis on independent review of the issue of arbitrator bias and appearance of bias. Thus in *Merit Ins. Co.* v. *Leatherby Ins. Co., supra,* 714 F.2d 673, 680, the court wrote: "Although we have great respect for the Commercial Arbitration Rules and the [AAA] Code of Ethics for Arbitrators, they are not the proper starting point for an inquiry into an award's validity under section 10 of the [federal act]. The arbitration rules and code do not have the force of law."

(9th Cir. 1984) 722 F.2d 1471, 1474-1475.) The cases merely stand for the proposition that a party which elects one forum will not be permitted to turn to the alternative forum later in the proceedings for a de novo determination of arbitrability. (*Id.* at p. 1475.) The Federal Arbitration Act contains no such provision for an election by the parties to have a court determine issues of arbitrator bias before or during an arbitration proceeding; accordingly, the labor law cases on the question of arbitrability are distinguishable.

The nonlabor case upon which respondents rely is *Aerojet-General Corp.* v. *American Arbitration Ass'n* (9th Cir. 1973) 478 F.2d 248, 252. There, the arbitration rules provided that AAA would choose the venue for arbitration if the parties could not agree. Plaintiff disagreed with AAA's choice of New York, and sued in federal district court in California for an injunction against the New York arbitration. On appeal from an order granting the preliminary injunction, the Court of Appeals reversed.

First, the court noted that the case before it concerned interlocutory judicial intervention in the arbitration. Such interlocutory review was to be available, "if at all, only in extreme cases." (478 F.2d at p. 251.) The court also noted: "It was part of the arbitration agreement that the AAA could select a locale for the arbitration if the parties failed to agree on one. . . . When the parties to a contract agree that a factual determination is to be made by a neutral third party that determination is upheld in the absence of fraud or gross mistake as would necessarily imply bad faith." (478 F.2d at p. 252, fn. 5.)

However, the court also distinguished questions of arbitrator bias from the venue question before it: "An arbitration award must be upheld unless it be shown that there was partiality on the part of an arbitrator [citing *Commonwealth Coatings Corp.* v. *Continental Casualty Co., supra*, 393 U.S. 145], or that the arbitrator exceeded his authority [citation], or that the award was rendered in 'manifest disregard of the law.'" (*Aerojet-General Corp.* v. *American Arbitration Ass'n, supra*, 478 F.2d at p. 252.)[6]

We perceive that arbitrator bias is a fundamentally different question from venue. The AAA has no vested interest in issues of venue. However, in the

[6]Similarly, in *Bernard* v. *Hemisphere Hotel Management* (1983) 16 Mass.App. 261 [450 N.E.2d 1084], the issue was not appearance of bias, but rather the arbitrator's fitness for the position. After the arbitration commenced, it became known the neutral arbitrator on a three-man panel was a convicted felon who had misspelled his name on his biography to hide that fact. On appeal from a trial court order directing the AAA to handle disqualification proceedings in a certain manner, the appellate court wrote that the matter of arbitrator qualifications should be left to AAA with very limited judicial review. The court then stated that, by contrast to the issue of qualifications, "[p]artiality of a neutral arbitrator, however, is one of several post-award issues over which courts have power of decision by statute." (*Id.* at p. 1086.)

present case AAA's agent or employee may have been the cause of a significant waste of time and money for the parties to the arbitration, if he failed in his duty to disclose and had to be removed from the arbitration. At the very least, removal of the arbitrator could involve thorny issues about who was to pay for the arbitrator's time up to his removal from the case.

It must be remembered that, even though state and federal policy favors private arbitration and the AAA is certainly a respected forum for such arbitration, AAA nevertheless is a business enterprise "in competition not only with other private arbitration services but with the courts in providing —in the case of private services, selling—an attractive form of dispute settlement. It may set its standards as high or as low as it thinks its customers want." (*Merit Ins. Co.* v. *Leatherby Ins. Co., supra,* 714 F.2d at p. 681.) We cannot ignore the fact that AAA has its own vested interest in a midarbitration declaration of arbitrator disqualification, an interest AAA does not have in such issues as venue and arbitration procedures.

In light of the explicit statutory authorization of judicial determination of "evident prejudice" of arbitrators as interpreted in *Commonwealth Corp.* v. *Casualty Co., supra,* 393 U.S. 145, we hold that a trial court considering a petition to confirm or vacate an arbitration award is required to determine, de novo, whether the circumstances disclose a reasonable impression of arbitrator bias, when that issue is properly raised by a party to the arbitration.

The trial court in the present case reached the opposite conclusion, favoring limited review of the AAA decision on the issue of appearance of bias. Accordingly, we find it necessary to remand this matter to the trial court for "an evidentiary hearing [at which] the full extent and nature of the relationships at issue may be ascertained." (*Sanko S.S. Co., Ltd.* v. *Cook Industries, Inc.* (2d Cir. 1973) 495 F.2d 1260, 1263.)[7]

### C. Did the Arbitrator Have a Duty to Disclose His Employment as McCormick's Expert Witness?

This is a nondisclosure case. It is not a case in which actual bias is alleged. Accordingly, its resolution is guided by *Commonwealth Corp.* v. *Casualty Co., supra,* 393 U.S. 145. The majority opinion in that case states: "[The Act shows] a desire of Congress to provide not merely for *any* arbitration but for an impartial one. It is true that petitioner does not charge before us that the third arbitrator was actually guilty of fraud or bias in

---

[7]We decline respondents' invitation to make our own de novo review of the "appearance of bias" issue. For reasons described below, resolution of this issue in respondents' favor requires a determination of credibility of witnesses particularly appropriate to a trial court proceeding. (See *Overseas Private Inv. Corp.* v. *Anaconda Co.* (D.D.C. 1976) 418 F.Supp. 107, 110-111.)

deciding this case, and we have no reason, apart from the undisclosed business relationship, to suspect him of any improper motives. But neither this arbitrator nor the prime contractor gave to petitioner even an intimation of the close financial relations that had existed between them for a period of years. We have no doubt that if a litigant could show that a foreman of a jury or a judge in a court of justice had, unknown to the litigant, any such relationship, the judgment would be subject to challenge. . . . [W]e can see no basis for refusing to find the same concept in the broad statutory language that governs arbitration proceedings and provides that an award can be set aside on the basis of 'evident partiality' or the use of 'undue means.' . . . We can perceive no way in which the effectiveness of the arbitration process will be hampered by *the simple requirement that arbitrators disclose to the parties any dealings that might create an impression of possible bias*." (*Id.* at pp. 147-149 [21 L.Ed.2d at pp. 304-305], italics added; see also *Overseas Private Inv. Corp.* v. *Anaconda Co., supra*, 418 F.Supp. at p. 110.)

After a thorough review of the cases interpreting *Commonwealth Corp.*, the Ninth Circuit Court of Appeals recently summarized the current state of the law in nondisclosure cases: "Other courts facing the same issue have held that 'evident partiality' is present when undisclosed facts show 'a reasonable impression of partiality.' " (*Schmitz* v. *Zilveti* (9th Cir. 1994) 20 F.3d 1043, 1046.) " 'Reasonable impression of partiality' . . . is the best expression of the *Commonwealth [Corp.]* court's holding." (*Id.* at p. 1047.) As phrased by the California Court of Appeal, an arbitrator is "under a legal duty to 'disclose to the parties any dealings that might create an impression of possible bias' " (*Johnston* v. *Security Ins. Co., supra*, 6 Cal.App.3d at pp. 843-844; see also *Betz* v. *Panko, supra*, 16 Cal.App.4th at p. 936.)

The parties acknowledge that the foregoing standard establishes the duty of an arbitrator to disclose his business relationships to AAA and to the parties. Similarly, both parties impliedly acknowledge that *if* McCormick had participated in the arbitration hearing on behalf of respondents, nondisclosure of the expert witness relationship would have created a reasonable impression of partiality.[8] (See *Wheeler* v. *St. Joseph Hospital, supra*, 63 Cal.App.3d 345 [physician arbitrator had served as medical expert witness for the attorneys for a party to the arbitration; award for that party vacated].) The fundamental point of disagreement between the parties arises from McCormick's more limited representation of respondents.

The record is clear that McCormick litigated against appellants and their arbitration attorneys in the trial court, both before and after the court directed

---

[8]Respondents' agreement on this point is, of course, qualified by their contention that appellants waived this claim by failing to act on their knowledge concerning Peterson's earlier employment as an expert witness.

the matter to arbitration. The record is also clear that McCormick did not conduct the arbitration hearing on behalf of respondents; that was Wildman's job.

Yet the record is also clear that, on December 2, 1991, John T. Savrnoch of McCormick mailed to Peterson a three-page letter on McCormick letterhead. The letter referenced the pending arbitration and requested issuance of a subpoena on behalf of respondents. This letter did not make reference to any limitation on McCormick's representation of respondents. Instead, it discussed matters of strategy and preparation for the arbitration hearings. The letter concludes: "By this letter, the attorneys for Alfa-Laval respectfully request that a records only deposition subpoena be served upon L&A Engineering, Inc. for the following documents . . . ." Respondents have not directed our attention to a substitution of counsel or any other prearbitration document that informs the arbitrator McCormick no longer represented respondents. It does appear from the record on appeal, however, that McCormick was not on the arbitrator's mailing list for subsequent correspondence in the arbitration.

Peterson apparently received and reviewed the December 2, 1991, letter. A response to the letter, over Peterson's signature, was directed to the McCormick attorney, as well as to the other relevant persons, including attorneys at Wildman. There is no express representation in Peterson's disclosure letters that he did not see the December 2, 1991, letter. Yet, if Peterson did review the December 2 letter, there is no explanation in the record for his repeated representation that he was unaware of McCormick's representation of respondents. And, if Peterson did review the letter and his response to it, there is no explanation how he knew prior to the hearing itself on January 6, 1992 (i.e., during the time when disclosure would have been required), that McCormick would not be participating. (See Peterson letter, excerpted at p. 1093, *ante.*)

On remand, the trial court will be required to determine what Peterson knew and when he knew it. The court will then be required to make a de novo determination of whether the circumstances give rise to a reasonable impression of possible bias. The question before the court will not be, as in most cases, whether the relationship *between the arbitrator and the attorneys* is substantial enough to raise questions. (Cf. *Banwait* v. *Hernandez* (1988) 205 Cal.App.3d 823, 830-831 [252 Cal.Rptr. 647].) It is. (*Wheeler* v. *St. Joseph Hospital, supra,* 63 Cal.App.3d at p. 372.) Instead, the question is whether the relationship *between the attorneys and the party* to the arbitration is substantial enough to create a reasonable impression of possible bias on the part of the arbitrator.

### D. *Did the Arbitrator Have Jurisdiction to Award Attorney Fees and Costs?*

■ Appellants contend the arbitrator did not have jurisdiction to award attorney fees and costs. As to both items, appellants contend the award was made more than 30 days after the matter was submitted to the arbitrator for decision. Since the submission established a time within which the arbitration would be concluded by final award, appellants argue that the arbitrator's jurisdiction expired on that date.[9]

As respondents argue, however, the fundamental fallacy in appellants' argument is that costs and fees *were* awarded in the initial award, entered well within the 30-day jurisdictional period. The final award provides, "Alfa-Laval Food and Dairy Co., a division of Alfa-Laval, Inc., is awarded its attorneys' fees and costs of suit, as against Helm Concentrates, Inc., and Britz, Inc., to be made by supplemental award following receipt and analysis of supporting declaration(s) from attorneys for Alfa-Laval Food and Dairy Co."

Appellants rely on Code of Civil Procedure section 1283.8,[10] and cases applying predecessor versions of that section (see, e.g., *Librascope, Inc.* v. *Precision Lodge No. 1600, Internat. Assn. of Machinists* (1961) 189 Cal.App.2d 71, 76-77 [10 Cal.Rptr. 795]), for the proposition that the 30-day award requirement is jurisdictional. Assuming that the procedural requirements of the California Arbitration Act contained in the Code of Civil Procedure govern these proceedings (see *Volt Info. Sciences, Inc.* v. *Leland Stanford Jr. U.* (1989) 489 U.S. 468, 476-478 [103 L.Ed.2d 488, 498-500, 109 S.Ct. 1248]), the defect in the award—i.e., failing to establish an exact dollar amount for the award of fees and costs—is at most a defect in the

---

[9]Secondarily, appellants argue that the arbitration clause of the contract did not mention "costs," and "There is consequently no support in the parties' agreements for an award of costs to Alfa-Laval." This issue was conclusively resolved against appellants by the Supreme Court's decision in *Advanced Micro Devices, Inc.* v. *Intel Corp.* (1994) 9 Cal.4th 362, 383 [36 Cal.Rptr.2d 581, 885 P.2d 994], decided after briefing in the present case was completed.

*Advanced Micro Devices* held that arbitrators "enjoy the authority to fashion relief they consider just and fair under the circumstances existing at the time of the arbitration, so long as the remedy may be rationally derived from the contract and the breach." (9 Cal.4th at p. 383.) Since costs would be awarded to the prevailing party under Code of Civil Procedure section 1032 if this matter had proceeded to superior court trial, such an award is clearly related to the full compensation of respondents for appellants' breach of the contracts, even if the precise costs awarded by the arbitrator could not have been awarded by a court.

[10]Section 1283.8 provides: "The award shall be made within the time fixed therefor by the agreement or, if not so fixed, within such time as the court orders on petition of a party to the arbitration. The parties to the arbitration may extend the time either before or after the expiration thereof. A party to the arbitration waives the objection that an award was not made within the time required unless he gives the arbitrators written notice of his objection prior to the service of a signed copy of the award on him."

form of the award. Pursuant to Code of Civil Procedure section 1284 (incorporating Code Civ. Proc., § 1286.6, subd. (c)), the arbitrator retained jurisdiction to correct the form of the award for 30 days after the final award was served on the parties. The date of service was no earlier than April 6, 1992. Accordingly, the May 6, 1992, "supplemental order" was a timely modification of the final order, correcting the form of the attorney fees and costs award.

### E.   Did the Trial Court Err in Awarding Prejudgment Interest?

Finally, appellants contend the trial court erred in awarding prejudgment interest, asserting three separate reasons. We will address each argument briefly.

First, appellants claim the court erred in awarding such interest because it was not demanded in the petition to confirm the award. However, it is well established that, in a contested action, prejudgment interest may be awarded, if the plaintiff is entitled to it, even though the complaint contains no prayer for interest. (*Sears, Roebuck & Co.* v. *Blade* (1956) 139 Cal.App.2d 580 [294 P.2d 140].) "The rationale of these cases is the simple proposition that in a contested action on a money claim which can be made certain by calculation, the matter of interest for the withholding of the money is 'embraced within the issue' (Code Civ. Proc., § 580) and the appropriate interest may be allowed even though not prayed for . . . ." (*Id.* at p. 596.) We can see no reason to distinguish between the award of interest on a complaint and on a petition to confirm an arbitration award.

Appellants' second contention is that respondents' claims were unliquidated—indeed, they were the subject of the "hotly disputed" arbitration, as appellants phrase it—and therefore could not be the subject of an interest award under Civil Code section 3287. That section provides, in part: "Every person who is entitled to recover damages certain, . . . and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day [with certain exceptions not relevant here]."

Interest was awarded not upon the unliquidated contract claims, as appellants contend, however, but solely upon the arbitration award from the date of the award. As of the date of the award, respondents were entitled to "recover damages certain" through entry of judgment confirming the award. (9 U.S.C. § 9; see Code Civ. Proc., §§ 1286, 1287.4.)

Third, appellants argue, as to attorney fees and costs, the award of prejudgment interest thereon "pile[s] 'damages' (interest) on top of other

'damages' (attorneys' fees and costs) which were themselves awarded on Alfa-Laval's modest breach of contract damage claim."

This argument again misconceives the subject of the superior court petition. The petition was not for an award of damages and attorney fees on the original contracts. That underlying dispute was the subject of the arbitration, and had been concluded by the time of the superior court petition to confirm the award. The arbitration award itself resulted in a new and fixed liability (see Code Civ. Proc., § 1287.6). Regardless of the individual elements that comprised that liability, respondents were entitled to payment of the fixed sum upon issuance of the award.

The arbitration award was the contractual equivalent of a judgment in respondents' favor. In the context of a judicial judgment, it is clear that interest after judgment accrues as to the entire award, including attorney fees. (See 8 Witkin, Cal. Procedure (3d ed. 1985) Enforcement of Judgments, § 40(d), p. 58.) The prejudgment interest awarded respondents served the same purpose here. Although the interest was pre-"judicial judgment," it was post-"contractual judgment." Any result that denied respondents this postaward interest would punish them for using arbitration instead of the court system to resolve their dispute with appellants.

DISPOSITION

The judgment is reversed and the matter is remanded to the trial court. The trial court shall conduct an evidentiary hearing on appellants' petition to vacate the arbitrator's award and respondents' petition to confirm the award. The issues at such evidentiary hearing shall be limited to the following: (1) whether the nature of the relationship between the McCormick firm and respondents, as known to the arbitrator prior to the issuance of the arbitrator's interim award, gives rise to evident partiality of the arbitrator based upon failure of the arbitrator to disclose to appellants his expert witness relationship with the McCormick firm; and (2) if so, whether the consequences of that failure to disclose are overcome by evidence presented on remand that the pertinent facts of evident partiality[11] were actually and timely revealed to or otherwise became known by appellants such that appellants have waived any right to complain about the arbitrator's failure to disclose.[12] If the court finds "evident partiality" and that such has not

---

[11]That is, the nature and extent of the relationship between the arbitrator and the McCormick firm.

[12]As respondents correctly raise in their petition for rehearing, their efforts to present waiver evidence in the earlier superior court proceedings became moot when that court dismissed appellants' petition to vacate. We thus find it appropriate to allow, on remand,

been overcome by evidence of waiver, then arbitration proceedings shall commence anew. If the court finds to the contrary, the judgment shall be reinstated. Appellants are awarded their costs on appeal.

Ardaiz, P. J., and Harris, J., concurred.

A petition for a rehearing was denied June 6, 1995, and the opinion was modified to read as printed above. Respondents' petition for review by the Supreme Court was denied August 10, 1995.

---

presentation of evidence of appellants' knowledge, limited to what appellants and their counsel knew during the narrow time frame from December 2, 1991, when the McCormick firm appeared in the arbitration at a time when Peterson was currently engaged as an expert witness by McCormick, and issuance of the interim award on May 22, 1992, the time frame during which, on the facts presented, appellants' failure to act on such knowledge may be the basis for finding waiver.